UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v.   ) | Criminal No. 1:19-cr-10121-MLW |
| ) | |
| ROBINSON GUZMAN,   ) | |
| ) | |
| Defendant.   ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Between November 20, 2018 and March 19, 2019, the defendant, Robinson Guzman, sold to an undercover officer (the "UC"), or possessed with intent to sell, approximately 360 grams of fentanyl and fentanyl analogue. The defendant sold this fentanyl in both powder and pill form, and the fentanyl pills he sold were made to look like legitimate, pharmaceutical quality, 30-milligram oxycodone pills.

On April 10, 2019, a federal grand jury returned a five-count Indictment charging Guzman with three counts of distribution of and possession with intent to distribute fentanyl (Counts One through Three), one count of distribution of and possession with intent to distribute 40 grams or more of fentanyl (Count Four), and one count of possession with intent to distribute 40 grams or more of fentanyl (Count Five). Docket No. 18. On July 1, 2020, the defendant pled guilty to the five-count Indictment. Docket No. 68. Counts Four and Five provide for a five-year mandatory minimum prison sentence. The government believes that the defendant has met all criteria under 18 U.S.C. § 3553(f), and therefore, this Court may sentence him for those Counts pursuant to the Sentencing Guidelines. There is no plea agreement in this case.

The government disagrees with the United States Probation Office's calculation of the defendant's guideline sentencing range in the Presentence Report, and believes the defendant's

1

total offense level should be 31, as described in greater detail below.  The government recommends a sentence of imprisonment of 108 months, the low end of the guideline sentencing range with the additional four-level enhancement applied.  The government does not recommend a term of supervised release to follow imprisonment, because it is not required by statute pursuant to 18 U.S.C. § 3553(f), and the defendant is a deportable alien who likely will be deported after imprisonment.  U.S.S.G. § 5D1.1(c).

## I.  ADVISORY SENTENCING GUIDELINES

The Presentence Report ("PSR") prepared by the United States Probation Office ("USPO"), found that the defendant was accountable for 115.04 grams of fentanyl, 246.15 grams of fentanyl analogue, and 2.55 grams of crack cocaine, for a total of 2,758.21 kilograms of converted drug weight.  PSR ¶ 63.[1]  Based on this total converted drug weight, the defendant's base offense level is 30.  PSR ¶ 64.  The USPO applied a two-level enhancement because it found that the defendant maintained a premises, 48 Whitman Street, Lawrence, Massachusetts, for the purpose of manufacturing or distributing controlled substances pursuant to U.S.S.G. § 2D1.1(b)(12).  PSR ¶ 65.  The USPO then applied a three-level decrease for acceptance of responsibility.   PSR ¶¶ 71-72.  The government believes that the defendant has met the criteria of 18 U.S.C. § 3553(f)(1)-(5), and therefore, another two-level decrease should be applied under U.S.S.G. § 2D1.1(b)(18).  PSR ¶ 74.  The government agrees with the above-portions of the USPO's guidelines sentencing range calculation, but believes that the Court should apply an additional four-level enhancement under U.S.S.G. § 2D1.1(b)(13) because the defendant knowingly misrepresented and marketed as oxycodone pills, pills that actually contained fentanyl.

---

[1] The paragraph references to the PSR refer to the initial draft of the PSR, disclosed on August 19, 2020.

With this additional four-level enhancement, the defendant's final total offense level should be 31.  The government agrees that the defendant is criminal history category I.  Based on this total offense level and criminal history, the defendant's guidelines sentencing range is 108 – 135 months imprisonment.  The government recommends a sentence of 108 months.

> **A.**     **The Two-Level "Stash House" Enhancement is Properly Supported.**

Because the defendant's primary residence was 32 Exchange Street, but he maintained his access to, and lease on, 48 Whitman Street, the premises he left from and returned to immediately before and after many of the drug deals in this case, and because he stored drugs and drug-packaging materials at this address, the USPO properly applied the two-level enhancement under U.S.S.G. § 2D1.1(b)(12).  The Sentencing Guidelines state: "If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels."  U.S.S.G. § 2D1.1(b)(12).  The Commentary provides additional criteria the Court should consider in applying the enhancement:

> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.
>
> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1, app. n.17.  Here, the record before the Court provides numerous indicia of control, use, and purpose sufficient to apply this enhancement.

First, the defendant admits that he held a possessory interest in 48 Whitman Street.  In his interview with the USPO, the defendant conceded that starting in 2017 until his arrest in March

3

2019, his primary residence was 32 Exchange Street, Apartment #2, Lawrence Massachusetts. PSR ¶ 93. Guzman lived in that apartment with his wife and three stepchildren. *Id.* Guzman stated that prior to living at 32 Exchange Street, he lived at 48 Whitman Street, where he met his wife. *Id.* In his objections to the PSR, the defendant further admitted that he "was a current leaseholder and former resident familiar with the family who resided at 48 Whitman Street at the time of his arrest." Guzman Objections to PSR ¶ 1d. Therefore, the defendant's own admissions support a finding that the defendant "held a possessory interest in (e.g., owned or rented) the premises." U.S.S.G. § 2D1.1, app. n.17.

Moreover, the PSR is replete with references to the defendant's use of 48 Whitman Street immediately before and after selling fentanyl to the UC in this case.

- PSR ¶ 20 (Guzman left 48 Whitman Street and immediately drove to meeting site where he sold fentanyl to the UC on December 19, 2018.);

- PSR ¶ 26 (Guzman left 48 Whitman Street immediately before his January 9, 2019 fentanyl sale to the UC.);

- PSR ¶ 34 (After his February 8, 2019 fentanyl sale to the UC, Guzman entered 48 Whitman Street carrying a black bag. Ten minutes later, he exited 48 Whitman Street without the black bag and locked the door with a key. Guzman drove to several different locations and returned to 48 Whitman Street.);

- PSR ¶ 39 (Guzman used a key to enter 48 Whitman Street then returned to his residence. A short time later he left his residence and drove to meet with the UC for the February 19, 2019 fentanyl sale.); and

- PSR ¶ 44 (Guzman left 48 Whitman Street immediately prior to his March 12, 2019 fentanyl sale to the UC.).

4

These visits to the 48 Whitman Street before and after the defendant's fentanyl sales to the UC show a pattern of using the premises to store drugs and drug proceeds.  Given that these visits to the premises were timed with drug sales to the UC, the USPO drew the supportable, and only logical conclusion, that the defendant was using 48 Whitman Street as a "stash house" for the purpose of manufacturing or distributing drugs.

Finally, after the defendant's March 19, 2019 arrest, officers searched both 32 Exchange Street and 48 Whitman Street.  At 48 Whitman Street, they found ample evidence of drug packaging and distribution, including: three plastic bags containing fentanyl, two cellophane wrapped packages containing fentanyl, two bottles containing cutting agents, a fentanyl press, spoon, sifter, funnel, scales, and dowel rods containing white powder, blender vessels covered in white powder, and a box of glassine bags and green cellophane wrap.  PSR ¶ 53.  In the defendant's residence, agents also found drugs, but did not find similar materials used in the packaging or distribution of drugs, such as presses, scales, spoons, or sifters.  PSR ¶ 55.  Given that manufacturing or distributing a controlled substance "need not be the sole purpose for which the premises was maintained," U.S.S.G. § 2D1.1, app. n.17, the evidence described above meets the standard for applying this two-level enhancement.

Although the defendant argues that there are innocent explanations for his short visits to 48 Whitman Street, the Court should not ignore that the short duration of those visits, combined with their timing immediately before or after the defendant sold fentanyl to the UC, suggest that the only plausible reason for these visits to 48 Whitman Street was to pick up drugs before drug sales and store drug proceeds after drug sales.  Given these facts, the Court should accept the USPO's recommendation and apply this two-level enhancement.

      **B.**      **The Defendant Knowingly Marketed as Oxycodone, Pills that Actually Contained Fentanyl, and Should Receive a Four-Level Enhancement.**

In four different controlled drug sales during this investigation, the defendant sold the UC 96 light blue pills marked "M / 30," which tested positive for the presence of fentanyl. The defendant knew that the pills contained fentanyl, even though in color and markings, the pills were identical to legitimate, pharmaceutical-grade 30-milligram oxycodone pills. Given the defendant's knowledge that the pills contained fentanyl, even though they were manufactured to mimic actual oxycodone pills, this Court should apply a four-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(13).

"If the defendant knowingly misrepresented or knowingly marketed as another substance a mixture or substance containing fentanyl . . . or a fentanyl analogue, increase by **4** levels." U.S.S.G. § 2D1.1(b)(13). In explaining the basis for this enhancement, the Sentencing Commission stated:

> Because of fentanyl's extreme potency, the risk of overdose death is great, particularly when the user is inexperienced or unaware of what substance he or she is using. To address this harm, the amendment adds a new specific offense characteristic at §2D1.1(b)(13) to provide for a 4-level increase whenever the defendant knowingly misrepresented or knowingly marketed as another substance a mixture or substance containing fentanyl or a fentanyl analogue. The Commission determined that it is appropriate for traffickers who knowingly misrepresent fentanyl or a fentanyl analogue as another substance to receive additional punishment. If an offender does not know the substance contains fentanyl or a fentanyl analogue, the enhancement does not apply. The specific offense characteristic includes a <u>mens rea</u> requirement to ensure that only the most culpable offenders are subjected to these increased penalties.

U.S.S.G. App. C. Supp., Amend. 807 (Nov. 2018). The Commission continued: "Although some purchasers of these substances may be aware that they contain fentanyl (or even seek them out for that reason), others may believe that they are purchasing heroin or pharmaceutically manufactured opioid pain relievers." *Id.* Thus, the key determination for this Court is whether,

despite the pills appearance as 30-milligram oxycodone pills, the defendant actually *knew* what he was selling was fentanyl. The evidence supports a finding that he did, in fact, know these pills contained fentanyl.

In this case, the only substances that the defendant ever sold the UC were fentanyl or fentanyl analogues.[2] PSR ¶ 63. In addition to the powder fentanyl, Guzman sold the UC fentanyl pills in four different drug sales on January 15, 2019, February 8, 2019, February 19, 2019, and March 12, 2019. PSR ¶¶ 30, 36, 40, 47. These pills tested positive for fentanyl and were nearly identical in appearance to 30-milligram oxycodone pills – light blue, marked "M / 30." Affidavit of DEA Task Force Officer Paul Callahan ¶¶ 7-9 (attached hereto as Exhibit A; hereinafter, "Callahan Aff.").

Additionally, through his text message exchanges with the UC, in the coded language common to drug traffickers, the defendant admitted that the pills were not legitimate oxycodone pills. In a January 9, 2019 text message exchange between the undercover officer and Guzman, the undercover officer asked, "I have a question. Can u get any pills[?]" Guzman responded, "[M]e 30[.]" The undercover officer stated, "Yea the blue ones[.]" Guzman replied, "[G]ive me the time to be ready[.]" PSR ¶ 25; Callahan Aff. ¶ 10. TFO Callahan stated that he understood this text message exchange to mean that Guzman was originally trying get actual 30-milligram oxycodone pills to sell to the UC ("me 30" and "the blue ones"). Callahan Aff. ¶ 12.

In a subsequent exchange on January 14, 2019, the UC stated, "Hey[.] Are you ready for tomorrow?" Guzman responded, "Yes[.] [O]nly the blues do not appear[.]" The UC replied, "U don't have any?" Guzman responded, "[N]ot original[.]" The UC stated, "Gimme 25 of what

---

[2] Officers also found a small quantity of crack cocaine in 48 Whitman Street, the defendant's stash house, during their search following the defendant's arrest, but the defendant never sold this substance to the UC. PSR ¶ 54.

you have tomorrow and I'll test them out[.]" Guzman responded, "Ok[.]" PSR ¶ 28; Callahan Aff. ¶ 11. The following day, on January 15, 2019, Guzman sold the UC 25 light-blue pills marked "M / 30," which tested positive for fentanyl. PSR ¶¶ 30-31; Callahan Aff. ¶ 11. Task Force Officer Callahan explained that Guzman's statements that the "blues do not appear," and that the pills were "not original," meant that Guzman was acknowledging that the pills were not actual oxycodone pills. Callahan Aff. ¶ 12. If the pills were actually 30-milligram oxycodone pills, why would the UC have to "test them out," as he stated in the text exchange? The most common counterfeit pills being sold by drug traffickers on the street are fentanyl pills made to look like 30-milligram oxycodone pills. *Id.* Based on the current prevalence of fentanyl pills in the drug trade, and the fact that the defendant only sold fentanyl or fentanyl analogue to the UC, Guzman's acknowledgement that the pills are "not original," was an acknowledgment that the pills contained fentanyl. *Id.*

Because Guzman knew the pills he sold the UC contained fentanyl, despite the fact that these pills were made to look like legitimate, pharmaceutical-quality 30-milligram oxycodone pills, his conduct falls squarely within the plain language of this enhancement. As the Commission noted in promulgating this enhancement, given the high potency of fentanyl, and the danger for overdose death, especially if a user believes he is using actual opioid pain relievers, rather than fentanyl pills, the defendant's conduct created an extreme risk of overdose death to the end-user and a four-level enhancement is appropriate.

## II.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Consideration of the § 3553(a) factors demonstrates that a sentence of 108 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

A. **Nature of the Offense**

The defendant sold a substantial amount of fentanyl and fentanyl analogue, 360 grams, to the UC in this case. The danger of fentanyl is well-documented. *See, e.g., United States v. Simms*, No. 1:19-CR-423, 2019 WL 7049930, *6 (N.D. Ohio Dec. 23, 2019) ("The distribution of fentanyl, one of the most deadly illegal drugs on the black market, poses an incredible threat to community members."); *United States v. Brown,* No. 17-00219-02, 2017 WL 4883375, *3 (W.D. Penn. Oct. 30, 2017) ("The Court is mindful that the distribution of fentanyl, in particular, has recently resulted in serious harm to the community—with multiple reports of overdoses and deaths resulting from that particular drug being reported in the news."). Fentanyl is a deadly drug that has created havoc in the United States, and more specifically in Massachusetts, over the past several years. Fentanyl is an extremely potent synthetic opioid that has become increasingly intertwined with heroin, both literally as an additive to make heroin more potent, and in terms of the overall drug marketplace.[3] "Fentanyl remains the primary driver behind the ongoing opioid crisis, with fentanyl involved in more deaths than any other illicit drug."[4] New England has been especially hard hit by the opioid crisis, and the DEA's data shows that fentanyl availability remains high in the region and increased from 2017 to 2018.[5] "2018 data shows that every day,

---

[3] U.S. Department of Justice Drug Enforcement Administration, *2019 National Drug Threat Assessment*, available at https://www.dea.gov/sites/default/files/2020-02/DIR-007-20%202019%20National%20Drug%20Threat%20Assessment%20-%20low%20res210.pdf, at 9-11 (last visited September 7, 2020) (hereinafter "DEA 2019 Assessment").
[4] *Id.* at 9.
[5] *Id.*

9

128 people in the United States die after overdosing on opioids."[6]  Synthetic opioids (such as fentanyl) were involved in 59.8% of all opioid-involved overdose deaths.[7]

In 2017, Massachusetts was among the top five states for fentanyl reports to the National Forensic Laboratory Information System.[8]  Massachusetts was also among the top-five states in age-adjusted rates of fentanyl involved overdose deaths.[9]  These statistics are not hypothetical; they describe the opioid overdose crisis occurring right now in this District.  The epidemic is real and being felt every day by families across Massachusetts and New England.  The defendant's crimes played a role in fueling this epidemic.

Additionally, the specific danger associated with the distribution of fentanyl-containing pills meant to look like pharmaceutical-quality oxycodone pills, like the ones the defendant distributed, is well documented: "Fentanyl-containing counterfeit pills continue to be associated with overdose deaths across the country. Fentanyl traffickers use fentanyl powder and pill presses to produce pills that resemble popular prescription opioids, such as oxycodone and hydrocodone, and other popular prescription drugs, such as alprazolam."[10]  Most critically, "[t]he inconsistent amount of fentanyl present in fentanyl-containing pills is another major contributor to pills' lethality."[11]  The increased lethality associated with fentanyl pills is precisely the reason why the Sentencing Commission added an enhancement for the knowing misrepresentation and marketing of fentanyl pills discussed in detail above.

---

[6] National Institute on Drug Abuse, *Opioid Overdose Crisis* (Revised May 2020), available at https://www.drugabuse.gov/drug-topics/opioids/opioid-overdose-crisis (last visited on September 7, 2020).

[7] Lawrence Schol, Puja Seth, Mbabazi Kariisa, Nana Wilson, Grant Baldwin, *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017,* Morbidity and Mortality Weekly Report (January 4, 2019), Centers for Disease Control and Prevention, available at https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm?s_cid=mm675152e1_w (last visited on September 7, 2020).

[8] DEA 2019 assessment at 10-11.

[9] *Id.* at 14.

[10] *Id.*

[11] *Id.* at 15.

Here, the defendant chose to distribute one of the deadliest drugs available, and increased the danger by distributing it in a form meant to look like something else – pharmaceutical-quality oxycodone. The damage he could have caused the community had his lethal products not been intercepted by law enforcement authorities is unknowable. What is knowable, is that the defendant chose to distribute fentanyl and fentanyl analogue, in both pill and powder form, from a premises used primarily for drug trafficking. Given the nature of his crimes, a sentence of 108 months in appropriate.

### B. Specific and General Deterrence

A significant sentence of imprisonment is warranted to deter others from becoming involved in any way, role, or capacity in the trafficking of fentanyl as the dangers associated with this deadly drug cannot be overstated. Individuals tempted to engage in drug trafficking must understand that *any* involvement with fentanyl, no matter how minimal, will have immediate and harsh consequences. Imprisonment is necessary to send a strong warning to others who might otherwise consider possessing or distributing this deadly drug.

Considerations of specific deterrence also support imposition of a sentence of 108 months for fentanyl distribution. The defendant sold a significant quantity of fentanyl. Based on his employment history, the defendant had other alternatives to selling drugs, namely working as a barber in Lawrence or as a laborer. PSR ¶¶ 101-02. Despite these employment opportunities, he still chose to sell fentanyl. A significant prison sentence is necessary to deter the defendant from ever engaging in drug trafficking after his release.

### III.   CONCLUSION

The government's sentencing recommendation takes into account the various factors set forth in § 3553(a) and the sentencing guidelines. The United States recommends a sentence of

108 months imprisonment. Based on the applicable sentencing guidelines, U.S.S.G. § 5D1.1(c), the government does not recommend a term of supervised release.

September 9, 2020                                   Respectfully submitted,

                                                    ANDREW E. LELLING,
                                                    United States Attorney

                                        By:         */s/ Stephen W. Hassink*
                                                    Stephen W. Hassink
                                                    Assistant U.S. Attorney

### CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I have served this sentencing memorandum on all appropriate parties through electronic filing on September 9, 2020.

                                                    */s/ Stephen W. Hassink*
                                                    Stephen W. Hassink
                                                    Assistant U.S. Attorney