UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. )          Cr. No. 19-10121-MLW
)
ROBINSON GUZMAN, )
    Defendant. )

<u>MEMORANDUM AND ORDER</u>

WOLF, D.J.                                        May 27, 2022

I. SUMMARY

Defendant Robinson Guzman pled guilty to possessing with intent to distribute fentanyl, fentanyl analogue, and crack cocaine, for a total 2,758.21 kilogram converted drug weight. Originally, Guzman faced a five-year mandatory minimum sentence. However, the court found that he satisfied the "safety valve" and, therefore, the mandatory minimum did not apply. The government asserted that the Guideline range for Guzman's sentence was 108 to 135 months and in its sentencing memorandum urged the court to impose a 108-month sentence.

The court calculated the Guideline range to be 70 to 87 months. It sentenced Guzman to 54 months in prison, a downward variance, primarily because, as his counsel Leonard Milligan argued, Guzman was an undocumented alien from the Dominican Republic and would be deported. <u>See</u> Apr. 7, 2021 Tr. (Dkt. No. 84) at 44. In explaining its sentence, the court emphasized the seriousness of the offense and noted that the defendant had come

to the United States "illegally and sold [] deadly drugs." Id. at 42.

The court also, as required by 18 U.S.C. §3553(a)(2)(B), addressed the need for the sentence imposed to afford adequate deterrence, meaning both specific and general deterrence. The defendant was living in Lawrence, Massachusetts, which has a large Dominican community and in other cases before this court has been characterized by the government as the "hub" of fentanyl coming into Massachusetts. See May 11, 2022 Tr. of Sentencing of Santo Vizcaino (Cr. No. 21-10051) (Dkt. No. 108) at 13-14. Many of the defendants sentenced by this court for distributing fentanyl have been undocumented Dominicans who were living in Lawrence and had come to the United States from the city of Bani.

In addressing the reasons for Guzman's 54-month sentence, the court stated, "Didn't you know people in Lawrence who were caught for selling drugs, . . . particularly fentanyl, locked up for a long time, and then deported[.]" Apr. 7, 2021 Tr. at 42. The court also stated that it had "to give a sentence that should send a message to other people, including other people from Bani, but not just them, that it's not just wrong, its dumb to come to this country and to sell drugs because you're going to get caught. You're going to get serious punishment, be separated from people you love, and then you're going to get deported." Id. at 44.

Guzman's counsel Mr. Milligan did not object to the court's reference to Bani in imposing sentence despite being offered an opportunity to do so. See id. at 45.

Guzman's national origin was first referenced at the sentencing hearing by Mr. Milligan concerning the calculation of the Guideline range for Guzman's sentence. In response, the court noted the large number of defendants from Bani it had sentenced in the past twenty years for selling drugs. Mr. Milligan then stated that he knew that many Dominicans were prosecuted for selling drugs, but he hoped the court would not consider that in sentencing because "it's his national origin" and he was "not sure it's appropriate." Id. at 13. Mr. Milligan also criticized prosecution efforts focused on Lawrence and Lynn, Massachusetts, where, he noted, many Dominicans reside. See id.

In response to Mr. Milligan's comments, the court stated:

[W]hether the defendant is from Bani or not is not material. It's not going to affect what the sentence is. But I don't think it's irrelevant because one of the statutory purposes of sentencing is general deterrence. And if there's a community, and not that large of a community, as I recall, where people are committing very similar crimes, the desire to send a message to that community, "Don't do this," is legitimate in my view. But I can assure you whatever sentence I give Mr. Guzman will not be influenced by the fact that he's from Bani.

Id. (emphasis added). Mr. Milligan responded, "[t]hank you, Your Honor." Id.

3

Despite the fact that he did not subsequently object to the court's statements in imposing sentence, Guzman appealed, alleging that the court impermissibly considered national origin in sentencing him to a below-Guideline prison term for selling fentanyl and other drugs. In a three-paragraph Judgment, the First Circuit stated:

> [W]e believe the record is unclear about whether the judge actually based the incarcerative term even in part on national origin. So we vacate the sentence and remand for resentencing with instructions for the judge to clarify his analysis (holding any further proceedings he deems necessary). We of course take no view of the length of the sentence to be imposed.

First Circuit Judgment (Dkt. No. 88).

For the reasons explained in this Memorandum, the court clarifies that it actually did not base its 54-month sentence in part on national origin except to the extent that, as Mr. Milligan argued, a below-Guideline sentence was justified largely because Guzman was an alien who would be deported. See Apr. 7, 2021 Tr. at 44. In addition, although the First Circuit did not direct the court to address the question, this court finds that a fully-informed, reasonable person could not believe that the court based its 54-month sentence on national origin in any way adverse to Guzman.

Accordingly, as the court carefully considered its original sentence, and it was not influenced by an impermissible consideration, it does not deem further proceedings necessary to

4

determine Guzman's sentence or to supplement the clarification of the original reasons for it provided in this Memorandum. The court intends to again sentence Guzman to serve 54-months in prison. The resentencing hearing shall be held on June 9, 2022, at 2:00 p.m. in the Moakley Federal Courthouse unless Guzman requests, by June 1, 2022, that the resentencing hearing be conducted by videoconference or waives his right to a resentencing hearing.

II.  THE FACTS

As indicated earlier, Guzman is an alien from Bani, Dominican Republic, who entered the United States illegally and pled guilty to five counts charging him with selling an amount of fentanyl and other drugs that made him subject to a five-year mandatory minimum sentence. However, the government represented that Guzman met the criteria of the "safety valve," 18 U.S.C. §3553(f)(1)-(5), see Dkt. No. 70 at 1, and, therefore, the mandatory minimum should not apply. The court accepted this representation.

In its sentencing memorandum, the government argued that the Guideline range for Guzman's sentence was 108 to 135 months, and that Guzman should be sentenced to 108 months in prison. In support of its recommendation, the government emphasized the lethal danger fentanyl presents, writing that:

> Fentanyl remains the primary driver behind the ongoing opioid crisis, with fentanyl involved in more deaths than any other drug. . . . In 2017, Massachusetts was among the top five states . . . in age-adjusted rates of

fentanyl involved overdose deaths. . . . The defendant's
crimes played a role in fueling this epidemic.

Id. at 9-10 (quotation marks and citation omitted). The government
also emphasized the requirement that the sentence imposed serve
the need for general deterrence, writing that:

A significant sentence of imprisonment is warranted to
deter others from becoming involved in any way, role, or
capacity in the trafficking of fentanyl as the dangers
associated with this deadly drug cannot be
overstated. . . . Imprisonment is necessary to send a
strong warning to others who might otherwise consider
possessing or distributing this deadly drug.

Id. at 11.

In his sentencing memorandum Guzman requested a 24-month
sentence, based in part on his national origin. He referenced
having grown up poor in the Dominican Republic. See Dkt. No. 71 at
13. Guzman also argued that because he was an alien who would be
deported to the Dominican Republic, it would be a waste of money
to detain him for more than 24 months, and cited the First
Circuit's decision in United States v. Hercules, 947 F.3d 3, 9
(1st Cir. 2020), in support of that contention. Id. at 12.

At the April 7, 2021 sentencing hearing, the court denied the
government's objection that the Total Offense Level as calculated
in the Presentence Report should be increased by four levels
because the defendant knowingly misrepresented pills containing
fentanyl to be merely Oxycodone. See Apr. 7, 2022 Tr. at 5-9. The
court also denied Guzman's objection that his Total Offense Level

6

should not be increased because he had leased a "stash house." Id.
at 10-16. In arguing in support of the objection, Mr. Milligan was
the first to raise the issue of Guzman's national origin at the
sentencing hearing, asserting that "[t]here is a tradition among
Dominican immigrants to . . . permit recent immigrants, whether
documented or undocumented, to occupy leaseholds even though the
leaseholder is no longer using the space." Id. at 11. However, Mr.
Milligan declined to identify the other person who was purportedly
using the "stash house." Id. at 12.

In response to an inquiry from the court, Mr. Milligan said
that Guzman had been living in Bani, a city in the Dominican
Republic. Id. The court then stated:

> I looked up once how many people there are in Bani, and
> there are an awful lot of them that come to the United
> States illegally and sell drugs. I've been sentencing
> them for 20 years, and I'm sure my colleagues have, too.

Id. Mr. Milligan responded:

> I've had the privilege of representing other residents
> of Bani, and I certainly understand that there are
> federal defendants that are frequently presented before
> the Court of this common place of descent, but I would
> hope the Court would not consider that in sentencing
> because, number one, I think it's his national origin
> and I'm not sure it's appropriate; and number two, I
> think the more substantial thing is, if I were really to
> expand upon my progressive views, it's also an
> enforcement issue. If we were -- that is to say, we've
> focused our prosecution efforts on areas in
> Massachusetts like Lawrence and Lynn that tend to focus
> heavily on Dominican and other resettled undocumented
> immigrants.

7

Id. at 12-13. As indicated earlier, the court then stated:

> I'd say the following. First of all, whether the
> defendant is from Bani or not is not material. It's not
> going to affect what the sentence is. But I don't think
> it's irrelevant because one of the statutory purposes of
> sentencing is general deterrence. And if there's a
> community, and not that large of a community, as I
> recall, where people are committing very similar crimes,
> the desire to send a message to that community, "Don't
> do this," is legitimate to my view. But I can assure you
> whatever sentence I give Mr. Guzman will not be
> influenced by the fact that he's from Bani.

Id. at 13 (emphasis added).  Mr. Milligan, seemingly satisfied,
responded, "[t]hank you, Your Honor." Id.

The court referenced Bani a second time in the 46-page
transcript of the sentencing hearing when it expressed concern
about the many prosecutions of lower-level, usually indigent, drug
dealers and few prosecutions of major suppliers who are more
dangerous and culpable.  See id. at 22-23.  More specifically, the
court stated that judges "see a lot of these cases, but the people
who get prosecuted and then put in prison and frequently deported
to Bani seem to be replaced by others with similar profiles." Id.
The court then said: "[I]t's been a long time since I've seen a
case involving some major supplier. So I hope you [the government]
are really trying to work up because those are the people who I
think are most dangerous and most culpable." Id. at 23.

In finding a Guideline enhancement was justified because
Guzman had leased a "stash house" full of paraphernalia for
manufacturing drugs, including pills containing fentanyl that

8

appeared to be merely Oxycodone, the court mentioned Bani a third time, stating that "unlike some people I've sentenced, including from Bani, . . . it doesn't look like he was at the lowest level of drug distributors." Id. at 36. Mr. Milligan responded in part, "you're not the only one that has seen people from Bani in drug cases from this very specific community.  Enforcement is robust . . . ." Id. at 37.

Following the court's ruling that the Guideline range was 70 to 87 months, see id. at 17, the government advocated a 70-month sentence. In doing so, it reiterated that, as written in its sentencing memorandum, its recommendation was mainly based on the need for deterrence. Id. at 24. In response, Mr. Milligan referenced the fact that Guzman was an alien unlawfully in the United States who would be deported, stating that "it is very appropriate for this court to consider the fact that he will be remanded to the Dominican Republic" and be separated from his wife and children in America.  Id. at 34.

The court mentioned Bani a fourth and final time in explaining the reasons for imposing a 54-month sentence, which was substantially below the 70 to 87 month Guideline range. The court's reasoning is contained in five pages of the transcript.  Bani is referenced in one five-word clause.

The court began the explanation of its sentence by stating:

> In essence[,] I've given you the sentence that I find is sufficient and no more than necessary to serve the statutory purposes of sentencing. The government's recommendation of 70 months is very reasonable. I was seriously considering sentencing you to at least 70 months in custody. And if I have a concern about the sentence I've just imposed, it's that it may be too little, not that it's too much. You committed an extremely serious crime. You were dealing. You were manufacturing, I infer, but you were dealing repeatedly a deadly drug.

Id. at 41. The court again emphasized that Guzman had committed "a very, very serious crime." Id. The court noted that Guzman was "not [being] prosecuted . . . for coming to the United States illegally so you could make money honestly and send it back to your family in the Dominican Republic," but rather because he had come to the United States illegally and sold "deadly drugs." Id. at 42.

The court also said that it believed that Guzman loved his wife and stepchildren in the United States. Id. It then made a comment relevant to the need of its sentence to serve the interest of general deterrence: "[W]hat did you think was going to happen? Didn't you know people in Lawrence who were caught selling drugs, . . . particularly fentanyl, locked up for a long time and then deported[.]" Id.

The court also expressly addressed the statutory requirement that its sentence be sufficient in view of the need for both

specific and general deterrence. After discussing the interest of specific deterrence, the court made a brief reference to Bani:

> And I have to give a sentence that should send a message to other people, including people from Bani, but not just them, that it's not just wrong, it's dumb to come to this country and to sell drugs because you're going to get caught. You're going to get serious punishment, be separated from people you love, and then you're going to get deported.

Id. at 44 (emphasis added).

The court then stated that "I have given you a lower sentence based on arguments that Mr. Milligan made." Id. It indicated that Guzman had benefited from his national origin, rather than having been adversely affected by it, because he was an undocumented alien who would be deported. See id.

After explaining the reasons for its sentence, the court afforded Mr. Milligan an opportunity to object to the sentence and the stated reasons for it by asking "[i]s there anything further in this matter for today[.]" Id. at 45. Mr. Milligan responded, "[n]ot for the defendant, Your Honor." Id.

In concluding the sentencing hearing, the court complimented the attorneys, stating that "[c]ounsel both did an excellent job and presented the competing considerations in a powerful way." Id.

If Mr. Milligan had objected to the court's reference to Guzman being a Dominican from Bani, the court would have told him truthfully that, as promised earlier, Mr. Guzman's sentence was not based even in part on his national origin except to the extent

11

that he had received a lower sentence because he was an alien who would be deported.

If Mr. Milligan had objected based on the contention subsequently made to the First Circuit that a reasonable observer would believe that Guzman's sentence was "infected by improper consideration of national origin," First Circuit Opening Brief (21-1325, Dkt. No. 8) at 18, the court would have amplified the record with additional information relevant to whether a fully informed, reasonable person would believe that the court was being untruthful when it assured Mr. Milligan that "whatever sentence I give Mr. Guzman will not be influenced by the fact that he is from Bani," Apr. 7, 2021 Tr. at 13.

I have a long history of assisting immigrants and refugees. For example, in 1975, when I was a Special Assistant to the Attorney General of the United States, I was, with five others, honored by President Gerald Ford for my "meritorious service in the resettlement of Indochinese Refugees in the United States." See Exhibit 1A.[1] In addition, for many years I was a member of the

---

[1] I have continued to be deeply involved with Cambodian refugees in the United States particularly. In 1999, I was honored by the Cambodian Mutual Assistance Association for my "untiring and devoted efforts on behalf of the Cambodian American Children of Greater Lowell, Massachusetts." See Exhibit 1B. In addition, in 2013, as Chief Judge of the United States District Court for the District of Massachusetts, I organized a photo exhibition at the Moakley Federal Courthouse of Cambodian war refugees, and related programming for students, which included a presentation by my

Advisory Board of the International Institute of New England, whose mission is to "create opportunities for refugees and immigrants to succeed through resettlement, education, career advancement, and pathways to citizenship." "About Us," International Institute of New England, https://iine.org/about/. My extrajudicial activities often involve mentoring students who are immigrants and children of immigrants, including students from the Dominican Republic and, indeed, from Bani.



young, close friend Ann Chorn Pond, a survivor of the Killing Fields of Cambodia. See "Cambodian Brings Story of Genocide to Younger Audience," Boston Globe (Nov. 8, 2012) (Exhibit 1C).

When my portrait was presented to the District Court, I chose Hilani Morales, a former Judge David S. Nelson Fellow, to speak on behalf of the hundreds of former students in the Ward, Nelson, and Albert Schweitzer Fellowship programs that I had founded or co-founded. See 698 F. Supp. 2d. XLI, XIII-XV (D. Mass. 2010) (Exhibit 3A); "Protégé Honors Judge at Portrait Unveiling," Boston Globe (June 6, 2010) (Exhibit 3B). Hilani was born in the Dominican Republic. ████████████████████████████████████████ ████████████████████████████████████████████ In her remarks, Hilani characterized her Nelson Fellowship as a "life-changing experience," in meaningful measure because I was one of her "lifetime" mentors. 698 F. Supp. 2d at XIV. She recounted how I had guided her through law school, attended her graduation, and conducted a special ceremony to make her a United States citizen. See id. I subsequently performed her wedding ceremony and hosted a small reception for her.

In addition, Hilani joined me for a program I started with Harvard College students in 2014 to teach poetry to fourth grade students at the Trotter School in Dorchester, Massachusetts. Many of the students are immigrants or children of immigrants, including from the Dominican Republic. Until the pandemic struck in 2020, I arranged an annual program for the students at the Moakley Courthouse. See "Budding Poets Hold Court," Boston Globe (Dec. 27, 2017) (Exhibit 4A). In March 2020, when asked to write a poem on

what makes them happy, some of the students wrote about me, and I wrote and recited a poem that began: "I think that I shall never do/ Anything happier than be with you."[2]

As indicated earlier, the foregoing are only examples of relevant information that could have been made part of the record of this case if Mr. Milligan had objected to the remarks I made in sentencing Guzman.

III. DISCUSSION

A. The Decision To Impose A 54-Month Sentence Was Not Based Even In Part On Guzman's National Origin Except To the Extent That He Received A Lower Sentence Because He Was A Deportable Alien

As explained earlier, Guzman appealed his sentence and asserted that the downward variance to a below-Guideline range 54-month sentence was infected by improper consideration of his national origin. As also explained earlier, the First Circuit remanded the case to this court writing that:

[W]e believe the record is unclear about whether the judge actually based the incarcerative term even in part

---

[2] Exhibit 4B is a photo of some students and me made from a video of me reciting the full poem:

I think that I shall never do
Anything happier than be with you.
You make my smile
Feel like a mile.
You make my heart
Feel very smart.
You make me feel that
I am you and you are me.
You make me happy
That I am we.

> on national origin.  So we vacate the sentence and remand
> for resentencing with instructions for the judge to
> clarify his analysis (holding any further proceedings he
> deems necessary). We of course take no view of the length
> of the sentence to be imposed.

First Circuit Judgment (Dkt. No. 88). This remand requires
clarification of a matter of fact.

When a defendant fails to make a contemporaneous objection at
sentencing, his claim is usually not preserved, and he may not
raise it on appeal unless he can show that the sentencing court
committed plain error. See United States v. Cortes-Medina, 819
F.3d 566, 571-72 (1st Cir. 2016); Fed. R. Crim. P. 51(b). Although
Mr. Milligan did not object to the court's comments in sentencing
Guzman, the Judgment of the First Circuit does not indicate that
it subjected the appeal to the usual standard of review for plain
error, which requires a showing that: "(1) that an error occurred
(2) which was clear or obvious and which not only (3) affected the
defendant's substantial rights, but also (4) seriously impaired
the fairness, integrity, or public reputation of judicial
proceedings." United States v. Millán-Román, 854 F.3d 75, 78 (1st
Cir. 2017). It is not clear why the plain error standard was not
utilized or said to be utilized.

Circuits have differed on whether the plain error standard
should be applied when there is a claim that national origin has
improperly influenced a decision by a District Judge. The Second
Circuit does not employ plain error review in such cases. See

16

United States v. Kaba, 480 F.3d 152, 156 (2d Cir. 2007); United
States v. Leung, 40 F.3d 577, 586 (2d Cir. 1994). The Eleventh
Circuit has rejected the approach of the Second Circuit on this
issue and explained its reasoning in detail:

> [One] reason that we reject [defendant's] position, and
> the Second Circuit's decisions on which it is based, is
> that they substantially undermine the important
> interests served by the contemporaneous objection rule.
> As we have explained, "The narrowness of the plain error
> rule is a reflection of the importance, indeed
> necessity, of the contemporaneous objection rule to
> which it is an exception." United States v. Pielago, 135
> F.3d 703, 709 (11th Cir. 1998). Requiring an objection
> at trial "fosters finality of judgment and deters
> 'sandbagging,' saving an issue for appeal in hopes of
> having another shot at trial if the first one misses."
> Id. Not only that, but . . .
>
> > [R]equiring timely objections allows trial
> > courts to develop a full record on the issue,
> > consider the matter, and correct any error
> > before substantial judicial resources are
> > wasted on appeal and then in an unnecessary
> > retrial. See United States v. Sorondo, 845
> > F.2d 945, 948-49 (11th Cir. 1988). A full
> > record and a prior decision in the district
> > court are essential ingredients to our
> > substantive review of issues -- they flesh out
> > an issue in a way the parties' briefs may not.
>
> Id. (omission in original); see also id. ("[T]he
> contemporaneous objection rule is essential to the
> integrity and efficiency of our judicial process....").
> The vital interests protected by the rule requiring an
> objection are discarded under the exception the Second
> Circuit has created that excuses the failure to object
> whenever a lawyer would be "understandably reluctant" to
> do so. See Kaba, 480 F.3d at 158; Leung, 40 F.3d at 586.
> And what lawyer will not be "understandably reluctant"
> to object if no objection is required? By not objecting
> the lawyer can avoid any risk that an ambiguous statement
> will be clarified or an actual error corrected on the
> spot in response to an objection; she can keep the issue

in her pocket in hopes that it will serve as a get-out-of-judgment-free card on appeal.

[Another] reason we reject [defendant's] position is that it is demeaning to both judges and attorneys. Judges know that it is the role and duty of attorneys to represent their clients zealously and object to what they perceive to be errors or potential errors. Many objections have as their premise that the judge has violated, or but for the attorney's intervention would violate, some law, rule of procedure, or right of the attorney's client. That is the stuff of which objections are made. To suggest that judges, whose solemn duty it is to apply the law fairly and impartially to all parties before them, would vindictively respond to an attorney's objection by punishing the client is demeaning to the judiciary. And to suggest that lawyers, who perceive a valid basis for objection, would cower in their seats, fearing retribution from the bench if they do object, is demeaning to the bar. We reject any vindictive judge or cowardly counsel exception to the contemporaneous objection rule.

United States v. Rodriguez, 627 F.3d 1372, 1379-80 (11th Cir. 2010)

(footnote omitted); see also United States v. Trujillo-Castillon,

692 F.3d 575, 578 (7th Cir. 2012) ("Trujillo-Castillon's second

argument is that his Cuban heritage negatively affected his

sentence. Because Trujillo-Castillon did not object at sentencing,

we review for plain error."); United States v. Afif, 365 F. App'x

506, 507 (4th Cir. 2010) (reviewing for plain error when defendant

argued that "the [district] court improperly based [his sentence]

on his status as an alien" and defendant did not raise this

argument at the district court).

There was no reason for Mr. Milligan to have been timid in

objecting to the court's explanation for its sentence because of

fear than an objection would prompt more severe punishment for
Guzman. If he had objected when offered the opportunity to do so
after the court imposed sentence and had explained the reasons for
his objection, Guzman's punishment could not have been increased.
See Fed. R. Crim. P. 35(a), (c) (limiting the court's authority to
alter a sentence after orally announcing it); see also United
States v. Goldman, 41 F.3d 785, 789 (1st Cir. 1994) (discussing a
previous version of Rule 35(c), which was substantially the same
as the current version of Rule 35(a)).

More significantly, the court would not have attempted to
increase Guzman's sentence because of the objection. The court
admires zealous advocacy, as evidenced by the fact that before
recessing the sentencing hearing the court complimented both
counsel for doing "an excellent job and present[ing] the competing
considerations in a powerful way." Apr. 7, 2021 Tr. at 45. As
stated earlier, however, if Mr. Milligan had objected and explained
his objection, the court would have amplified the record, which
might have obviated the need for the First Circuit's remand for
clarification and resentencing, and perhaps the need for the First
Circuit to consider this case again on a second appeal.

In any event, this court now confirms that its 54-month
sentence was not based even in part on Guzman's national origin
except to the extent that the court imposed a lower sentence than
it otherwise would have because Mr. Milligan persuasively argued

that Guzman was an alien who would be deported.[3] For the reasons explained below, the court continues to believe that its reference to wanting the sentence to deter Dominicans from Bani living in Lawrence from selling deadly drugs in Massachusetts, as many admit to doing in cases before this court, was permissible and appropriate.

However, the desire to send that message did not in fact affect the court's decision to sentence Guzman to a below-Guideline 54 months in prison. Even absent the interest of general deterrence, in view of the dangerous, often deadly nature of Guzman's crime, the court would not have found a greater variance to a lower sentence sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" as required by 18 U.S.C. §3553(a)(2)(A). Evidence of this includes the court's statement

---

[3] The court also again notes that it was Mr. Milligan, not the court, who first raised Guzman's national origin, both in his sentencing memorandum and during the sentencing hearing. In similar circumstances, the Eighth Circuit "note[d] [defendant] first introduced and emphasized her Laotian heritage and culture as a basis for sentencing leniency. . . . Having raised her race and national origin, [defendant], without more, should not be permitted to use her Laotian culture as both a shield and a sword." United States v. Kouangvan, 844 F.3d 996, 1000 (8th Cir. 2017); see also United States v. Sufi, 455 F. App'x 672, 679 (6th Cir. 2012) ("[I]n his sentencing memorandum [defendant] repeatedly referred to his national origin and naturalized status in support of his request for a downward variance. Thus, [defendant] cannot complain that the district court discussed his national origin and naturalized status at sentencing.").

that "if I have a concern about the [54-month] sentence I've just imposed, it's that it may be too little, not that it's too much" in view of the "extremely serious" offense. Apr. 7, 2021 Tr. at 41.

Although not material to its decision to impose the 54-month sentence, the court is now amplifying the reasons it believes that its references to trying to send messages to the communities of Lawrence -- which in fentanyl cases before this court is virtually synonymous with the community of undocumented Dominicans in Lawrence -- and of Bani, Dominican Republic were permissible and appropriate to address the §3553(a)(2)(B) requirement that Guzman's sentence be sufficient "to afford adequate deterrence to criminal conduct."

The First Circuit Judgment in this case states that:

Congress says that sentencing must be "entirely neutral as to . . . national origin." See 28 U.S.C. §994(d). Which explains why the sentencing guidelines state that "national origin" is "not relevant in the determination of a sentence." See U.S.S.G. §5H1.10.

Dkt. No. 88. However, as the citation in footnote 1 of the Judgment to Hercules, 947 F.3d at 9, implicitly recognizes, §994(d) is a direction from Congress to the Sentencing Commission, not to

federal judges.[4] More importantly, it is not to be interpreted

literally. In Hercules, the First Circuit wrote that:

> Under appropriate circumstances, a defendant's potential
> deportation may properly be considered as part of a
> broader assessment of his history and characteristics
> pursuant to section 3553(a)(1). On the right factual
> record, a defendant's potential deportation also may
> prove relevant to whether a sentence will adequately
> "protect the public from further crimes of the
> defendant." 18 U.S.C. §3553(a)(2)(C).

947 F.3d at 9. This court believes that "on the right factual

record" -- which this case does not provide because, as explained

earlier, Guzman's sentence was not increased to serve the interest

of general deterrence -- the desire to send a message to

individuals in a community in Massachusetts and in a foreign

country should also be found by the First Circuit to be permissible

and appropriate.

"General deterrence is about preventing criminal behavior by

the population at large and, therefore, incorporates some

consideration of persons beyond the defendant." United States v.

Politano, 522 F.3d 69, 74 (1st Cir. 2008) (citing U.S.S.G. ch. 4,

pt. A, introductory cmt.). Therefore, the First Circuit has "made

clear that, in considering the need for deterrence, see 18 U.S.C.

§3553(a)(2)(B), district courts may take into account not only the

need for individual deterrence, but also the need for community

---

[4] 28 U.S.C. §994(d) states that "[t]he [Sentencing] Commission
shall assure that the guidelines and policy statements are entirely
neutral as to . . . national origin." (emphasis added).

deterrence within the defendant's particular community." Millán-Román, 854 F.3d at 79.

The cases cited by the First Circuit for this proposition each involved a community in the United States. See United States v. Flores-Machicote, 706 F.3d 16, 22-23 (1st Cir. 2013) (Puerto Rico); United States v. Lozada-Aponte, 689 F.3d 791, 793 (1st Cir. 2012) (Puerto Rico); Politano, 522 F.3d at 74 (Brockton, Massachusetts). Therefore, these citations indicate that the court's desire that Guzman's sentence send a message to the Lawrence, Massachusetts community was permissible and appropriate.

The court believes that there are undoubtedly many honest, otherwise law-abiding Dominicans in Lawrence who are in the United States unlawfully. However, with regard to defendants from Lawrence charged with selling fentanyl, "the community" is at least substantially composed of Dominicans, many of whom are from Bani. See, e.g., May 11, 2022 Tr. of Sentencing of Santo Vizcaino (Cr. No. 21-10051) (Dkt. No. 108) at 13-15 (sentencing of Dominican defendant from Bani for distribution of fentanyl in Lawrence)[5];

---

[5] At Santo Vizcaino's sentencing, the government explained that "the background of fentanyl in Massachusetts is that Lawrence appears to be the hub[] of fentanyl coming into this state from other states" and that "it appears to be a not too uncommon history here[, where w]e have someone like [defendant] who comes to this country from a very difficult place, the Dominican Republic. . . . But he didn't come here just to work gainfully or to work a meaningful job. He sold drugs with his brother." Id. at 13-14.

May 6, 2021 Tr. of Sentencing of Gonzalez Sepulveda and Sandy Alejandro Reynoso Cruz (Cr. No. 18-10360) (Dkt. No. 199) at 36-37, 49-50 (sentencing of two Dominican defendants, including one from Bani, for conspiracy to distribute fentanyl in Lawrence and Revere, Massachusetts)[6]; see also Santo Vizcaino Presentencing Report (under seal) at 2; Sandy Reynoso Cruz Presentencing Report (under seal) at 3.

Indeed, Mr. Milligan essentially acknowledged this at Guzman's sentencing hearing when he criticized the government for focusing its "prosecution efforts on areas in Massachusetts like Lawrence and Lynn that tend to focus heavily on Dominican and other resettled undocumented immigrants." Apr. 7, 2021 Tr. at 13. Therefore, although the First Circuit has made clear that district judges "may take into account . . . the need for community deterrence within the defendant's particular community," Millán-Román, 854 F.3d at 79, in this case Lawrence, Guzman is arguing that explicit reference to the Dominicans, including those from

---

[6] At the sentencings of Gonzalez Sepulveda and Reynoso Cruz, one of the defendant's attorney stated that "there are a lot of individuals who are poor, who are looking for ways of surviving, make poor choices, and selling narcotic is one of them" and "[c]ertainly people in this area who are poor and disadvantaged who live in this part of Massachusetts, might be from Bani, might see people in the Dominican Republic who seem to do well, maybe get that idea." May 6, 2021 Tr. of Sentencing of Gonzalez Sepulveda and Sandy Alejandro Reynoso Cruz (Cr. No. 18-10360) (Dkt. No. 199) at 49-50.

Bani, who his counsel admits substantially comprise the part of that community to which the message was intended, is unlawful.

To the extent that the court was also seeking to send a message to Dominicans in Bani, case law supports the conclusion that its comments were also legally permissible and appropriate. In a series of cases, the Seventh Circuit has held that an express reference at sentencing to a defendant being from a particular foreign community to promote general deterrence is permissible. For example, in United States v. De La Cruz, 870 F.2d 1192, 1196-98 (7th Cir. 1989), the Seventh Circuit held that where, as in this case, the district judge "gave consideration to the individual characteristics of the defendant as well as the goal of general deterrence," it was permissible for him to have referred to the fact that the defendant was from Cuba. More specifically, the Seventh Circuit wrote that:

> Within this goal of general deterrence, we have allowed the sentencing judge to take into consideration the defendant's relationship with a country known for its criminal activity. In United States v. Gomez, 797 F.2d 417 (7th Cir. 1986), the Court affirmed the district court's recognition of the defendant's status as an illegal alien from Colombia in sentencing him for a drug-trafficking crime, so long as such sentencing was not "mechanistic". "The nationality of Gomez, and his illegal entry and entrance into the illicit drug business, are too related to be artificially separated for sentencing purposes. * * * Nor is the sentencing judge constitutionally required to ignore the identity of the countries which are recognized as often the source of the narcotic problems of this country and from which drug traffickers immigrate to this country. It is within the court's prerogative to send a message, a strong one

> if need be, in the hope that the sentence may serve as
> a deterrent. * * * As the government on appeal points
> out, the court's concern was not ethnic, but geographic,
> geographic because Colombia has the reputation of being
> narcotically troublesome." Gomez, 797 F.2d at 420.[7]

Id. at 1196. The First Circuit has favorably cited Gomez for the

proposition that "deterrence is a common and permissible

consideration in sentencing." United States v. Jimenez-Rivera, 842

F.2d 545, 549 (1st Cir. 1988) (citing Gomez, 797 F.2d at 420).

In addition, in United States v. Munoz, the Fourth Circuit

affirmed the sentence of a defendant who "contend[ed] that the

sentencing judge's remarks reveal an improper bias against him

based on his Colombian nationality." 974 F.2d 493, 495 (4th Cir.

1992). The Fourth Circuit held that:

> [t]he court may [] impose a sentence to deter similar
> criminal conduct by others, . . . and so may refer to
> those, as a group, whom the court seeks to deter. . . .
> A fair reading of the entire transcript from the
> proceeding below [] leads us to conclude that the court's
> comments were directed at drug traffickers from Colombia
> and Florida, and not Colombians or South Americans,
> generally.

Id. at 495-96 (emphasis in original). Cf. United States v. Borrero-

Isaza, 887 F.2d 1349, 1356 (9th Cir. 1989) ("It would be

---

[7] In Gomez, the Seventh Circuit also stated that "[t]he sentencing
judge need not shut his eyes to the reality of the factual
situation before him and pretend that the defendant is not an
illegal alien from Colombia who has pleaded guilty to a drug
violation." 797 F.2d at 419. Indeed, "[f]aced with the
responsibility of sentencing [defendant], the judge could not, and
would have been remiss if he did, ignore the realities of the
case." Id. at 420.

appropriate [] for a sentencing court to consider the fact that a criminal has trafficked in drugs originating from a source country, like Colombia. . . . However, the Constitution demands that the focus be on the source of the drug trafficking.") (emphasis in original).

In Trujillo-Castillon, a case on which Guzman relies, the Seventh Circuit explained that:

> In United States v. De La Cruz, we held that a sentencing court's reference to a defendant's Cuban heritage did not require a remand. 870 F.2d 1192, 1196 (7th Cir. 1989). Defense counsel in that case raised the issue as support for a lesser sentence. The court, however, "made it clear that he did not accept the defense counsel's characterization of De La Cruz as a political prisoner from Cuba, but regarded him as a 'big time' drug dealer who had been involved with other prominent convicted Cuban drug traffickers." Id.

692 F. 3d at 579.

However, in Trujillo-Castillon, the Seventh Circuit remanded for resentencing because of the sentencing judge's many references to the defendant's Cuban heritage and crimes committed by Cubans in the United States. Id. at 577. In doing so, it cited a case in which the Eighth Circuit remanded because "'we cannot say that the district court would have imposed the same sentence absent this impermissible consideration' of the defendant's status as a Nigerian immigrant." Id. at 579-80 (quoting United States v. Onwuemene, 933 F.2d 650, 652 (8th Cir. 1991)). In contrast, in the instant case the court unequivocally stated that "[w]hether the

27

defendant is from Bani or not is not material. . . . I can assure you whatever sentence I give Mr. Guzman will not be influenced by the fact that he's from Bani." Apr. 7, 2021 Tr. at 13.

Here, as discussed earlier, Guzman's national origin was first raised by his counsel, not the court. See Kouangvan, 844 F.3d at 1000; Sufi, 455 F. App'x at 679. In addition, in explaining its sentence, the court was not "mechanistic," and did not focus on defendant's nationality or disproportionately emphasize the interest of general deterrence. See De La Cruz, 870 F.2d at 1196; Gomez, 797 F.2d at 420. Rather, the court explicitly considered all of the relevant §3553(a) sentencing factors, and only briefly addressed the interest of general deterrence. See Apr. 7, 2021 Tr. at 40-45. The court did give significant weight to the fact that Guzman was a deportable alien in imposing a 54-month sentence that was 16 to 33 months below the Guideline range. This downward variance undermines the claim that Guzman was adversely affected because he was an alien. See Rodriguez, 627 F.3d at 1381 ("It seems to us unlikely that a reasonable observer, aware of all of the record facts, would have inferred that the court imposed a longer sentence on [defendant] because of how she came to reside in this country. The sentence was 91 months, which was a 60-month variance below the lower end of the advisory range of 151 to 188 months."). Finally, the court assured Guzman that the fact that he was from Bani would not affect his sentence. Compare Trujillo-Castillon,

28

692 F.3d at 579 (vacating sentence when the district court "did nothing to reasonably assure the defendant that his Cuban heritage would not factor into its calculus"). Guzman's counsel, Mr. Milligan, seemingly accepted this assurance, thanking the court, Apr. 7, 2021 Tr. at 13, and not objecting to the sentence or the reasons for it, id. at 45.

The First Circuit has stated that "to the extent the district court's explanation is grounded in 'case specific considerations,' we accord a 'respectful deference' to its 'fact-intensive sentencing decisions.'" Politano, 522 F.3d at 74. The record here reflects a case-specific consideration of the relevant sentencing criteria, a reference to Bani only in relation to the required consideration of general deterrence, and the court's explicit assurance that the fact that Guzman is Dominican, and the interest of general deterrence would not affect the sentence ultimately imposed. The court reiterates that its 54-month sentence was not based even in part on Guzman's national origin except to the extent that the court imposed a lower sentence than it otherwise would have because Guzman was an alien who would be deported. See Hercules, 947 F.3d at 9. This court hopes and trusts that this appropriately responds to the First Circuit's direction that the actual reasons for its sentence be clarified.

B. A Reasonable Person Could Not Believe That Guzman's
Sentence Was Based Even In Part On His National Origin Except
To The Extent That He Received A Lower Sentence Because He
Was A Deportable Alien.

As explained earlier, the First Circuit remanded this case
for clarification of the factual question of whether the court
"actually based the [54-month] incarcerative term even in part on
national origin." First Circuit Judgment (Dkt. No. 88). It did not
order the court to address the question of whether a reasonable
person could mistakenly believe that Guzman was adversely affected
at sentencing because of his national origin. See id. However, in
his appeal Guzman argued that his case should be remanded for
resentencing because the "court relied on a factor that Congress
and the Sentencing Commission explicitly forbid courts to
consider" and, alternatively, because "a reasonable observer would
understand from the court's remarks that national origin affected
the sentence." First Circuit Opening Brief (21-1325, Dkt. No. 8)
at 13, 15.

For his claim that a reasonable observer would believe he was
adversely affected by his national origin, Guzman relied primarily
on the Second Circuit's decision in Kaba, 480 F.3d at 152-56, and
the Seventh Circuit's decision in Trujillo-Castillon, 692 F.3d at
579 -- two decisions not cited by the First Circuit in its
Judgment. Nevertheless, in the interests of completeness and
minimizing the risk that, if there is a second appeal, the First

Circuit will perceive a need for further clarification, the court is addressing this question. As explained below, the court believes that a reasonable person could not think that Guzman's sentence was affected by the fact that he was an undocumented alien from Bani, Dominican Republic except to the extent that he received a below-Guideline sentence that was lower than otherwise would have been imposed because he was an alien and would be deported.

In Kaba, the Second Circuit stated that vacatur and remand is warranted when the sentencing court's conduct does not "satisfy the appearance of justice," regardless of any "proof of actual bias." Kaba, 480 F.3d at 156 (quoting Leung, 40 F.3d at 586) (internal quotations omitted). The Second Circuit has indicated that the issue is whether a "'reasonable observer, hearing or reading the quoted remarks, might infer, however incorrectly, that [a defendant's] ethnicity and alien status played a role in determining [his] sentence.'" Kaba, 480 F.3d at 156 (quoting Leung, 40 F.3d at 586-87); see also Trujillo-Castillon, 692 F.3d at 579. This is an objective standard.

The objective reasonable observer standard is analogous to the objective standard in 28 U.S.C. §455(a), which requires that even a judge who is not actually biased or prejudiced must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Section 455(a) is based on the premise that in some circumstances "a reasonable person may

31

question impartiality without the presence of any evidence that a judge is subjectively biased." In re Bulger, 710 F.3d 42, 46 (1st Cir. 2013).[8]

The standard for determining a motion for disqualification under §455(a) is "[w]hether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. §455, but rather in the mind of the reasonable man." United States v. Voccola, 99 F.3d 37, 42 (1st Cir. 1996) (quoting United States v. Cowden, 545 F.2d 257, 265 (1st Cir. 1976)). Therefore, the disqualification issue must be analyzed from the perspective of "an objective, knowledgeable member of the public," rather than from the perspective of a person involved in, or directly affected by, the case. El Fenix de Puerto Rico v. M/Y JOHANNY, 36 F.3d 136, 141 (1st Cir.1994) (quoting In re United States, 666 F.2d 690, 695 (1st Cir. 1981)).

This test asks "whether a reasonable person, fully informed of all the facts, would doubt [the judge's] impartiality." In re United States, 158 F.3d 26, 31 (1st Cir. 1998) (emphasis added); see also United States v. Vazquez-Botet, 532 F.3d 37, 48 (1st Cir.

---

[8] The description of the standards for recusal under §455(a) in this Memorandum is derived from this court's discussion in United States v. Sampson, 148 F. Supp. 3d 75, 79-80, 85-88 (D. Mass. 2015).

2008); El Fenix de Puerto Rico, 36 F.3d at 141; Home Placement Serv., Inc. v. Providence J. Co., 739 F.2d 671, 676 (1st Cir. 1984). The proper perspective has been described as that of "the reasonable man on the street . . . who knows the full facts even if those facts are not known on the street." Ricci v. Key Bancshares of Me., Inc., 111 F.R.D. 369, 374 (D. Me. 1986) (Aldrich, J., sitting by designation).

The conduct that has prompted the inquiry is not to be considered in isolation. Rather, the record as a whole must be considered. See In re Cargill, Inc., 66 F.3d 1256, 1260 (1st Cir.1995) (reviewing recusal in light of "careful perscrutation of the record"). Cf. United States v. Ayala-Vazquez, 751 F.3d 1, 23 (1st Cir. 2014) ("[W]hen a defendant claims he has been prejudiced through a trial judge's interventions at trial, '[c]harges of partiality should be judged not on an isolated comment or two, but on the record as a whole.'" (quoting United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1998))).

Moreover, "judges . . . are presumed to be impartial and to discharge their ethical duties faithfully so as to avoid the appearance of impropriety." First Interstate Bank of Ariz., N.A. v. Murphy, Weir & Butler, 210 F.3d 983, 988 (9th Cir. 2000); see also In re Aguinda, 241 F.3d 194, 204 (2d Cir. 2001) ("[T]he presumption is that a judge will put personal beliefs aside and

rule according to the laws as enacted, as required by his or her oath.").

Based on the evidence in the transcript of Guzman's sentencing hearing, a reasonable, fully informed person would understand the court's references to Bani at the hearing before sentence was imposed to be appropriate rather than manifestations of impermissible bias based on Guzman's national origin. The issue of Guzman's national origin was argued as a factor favoring a lower sentence by his counsel, Mr. Milligan, in his sentencing memorandum. See Dkt. No. 71 at 12-13. More specifically, Mr. Milligan argued that Guzman grew up in poverty in the Dominican Republic and would be deported after serving any prison sentence. See id. In addition, Mr. Milligan was the first to reference Guzman's national original at the sentencing hearing when he argued that, although Guzman had leased the "stash house" filled with drugs and drug paraphernalia, there was a "tradition among Dominican immigrants to . . . permit recent immigrants, whether documented or undocumented, to occupy leaseholds even though the leaseholder is no longer using the space." Apr. 7, 2021 Tr. at 11. Mr. Milligan also argued that the fact that Guzman was an undocumented Dominican who would be deported justified a lower sentence, id. at 34, and the court was persuaded by this argument, id. at 44.

Therefore, among other things, a reasonable person would believe that the court's few references to Guzman's national origin were permissible responses to issues his counsel had raised and appropriate rather than manifestations of unlawful bias. See Kouangvan, 844 F.3d at 1000, 1002 (finding that a reasonable observer, viewing statements in context, would not suspect that any prohibited considerations infected the district court's sentencing decision, in part because the defendant "first introduced and emphasized her Laotian heritage and culture as a basis for leniency"); Sufi, 455 F. App'x at 679 (finding that it was permissible for the court to say it was sentencing defendant at the high end of the Guideline range because the defendant was not a United States citizen and "repeatedly referred to his national origin . . . in support of his request for a downward variance").

More specifically, a reasonable observer could not construe the court's few references to Bani before imposing sentence to be manifestations of bias based on national origin. The court made only three such references to Bani, and each was in response to an argument by Guzman's counsel. See id. at 12-13, 23, 36. One reference was in the context of encouraging the government to attempt to prosecute higher-level criminals who profit greatly from the distribution of fentanyl and other drugs, and are often not Dominican, rather than prosecuting lower-level Dominican

dealers "who get prosecuted and then put in prison and frequently deported to Bani." Id. at 22-23.[9] The third reference to Bani by the court was that "unlike some people I've sentenced, including from Bani, . . . it doesn't look like [Guzman] was at the lowest level of drug distributors." Id. at 36. A reasonable observer would interpret the court's encouraging the investigation and prosecution of more dangerous criminals, who profit greatly from dealing lethal drugs, rather than indigent, lower-level dealers from Bani, as evidence of sympathy for the plight of Dominican defendants generally and Guzman particularly, rather than as evidence of prejudice based on national origin.

A reasonable observer would also know that when the court explained why it was imposing a below-Guideline 54-month sentence, it discussed all of the required §3553(a) factors, particularly the need for a sentence sufficient to recognize the extremely serious nature of the crime of dealing fentanyl. See id. at 41-45. That observer would know that in imposing sentence the court mentioned Bani only once, when it addressed, as required by §3553(a)(2)(B), the need for the sentence to be sufficient to serve

---

[9] This court has been educated to understand in other cases that higher-level manufacturers, importers, and distributors of fentanyl are often Chinese and Mexican, not Dominican. See May 11, 2022 Tr. of Sentencing of Santo Vizcaino (Cr. No. 21-10051) (Dkt. No. 108) at 16; May 6, 2021 Tr. of Sentencing of Gonzalez Sepulveda and Sandy Alejandro Reynoso Cruz (Cr. No. 18-10360) (Dkt. No. 199) at 49.

the interest of deterrence, which includes general deterrence. See
Politano, 522 F.3d at 74. In doing so, the court stated that "I
have to give a sentence that should send a message to other people,
including people from Bani, but not just them," that they should
not come to the United States and sell drugs. Apr. 7, 2021 Tr. at
44. A reasonable observer would recognize that the court had not
singled out people from Bani or foreigners as the only individuals
the court was seeking to deter from selling drugs. See also
Kouangvan, 844 F.3d at 1000; Sufi, 455 F. App'x at 679. Compare
Trujillo-Castillon, 692 F.3d at 577; Kaba, 480 F.3d at 158.

The court also mentioned once people in Lawrence,
Massachusetts who were caught selling fentanyl, imprisoned, and
deported. See Apr. 7, 2021 Tr. at 42. As Mr. Milligan noted,
federal prosecutions in Massachusetts "tend to focus heavily on
Dominican[s]." Id. at 13. A reasonable observer would not, however,
construe the court's comment about Lawrence to be an indication of
bias or prejudice against Dominicans. Rather, he or she would know
that the First Circuit has "made clear that, in considering the
need for deterrence, district courts may take into account not
only the need for individual deterrence, but also the need for
community deterrence within the defendant's particular community."
Millán-Román, 854 F.3d at 79 (citation omitted).

A reasonable observer would also know that, although the First
Circuit has not addressed the issue, other courts have held that

37

it is permissible for a sentencing judge to seek to discourage nationals of particular countries who often come to the United States and sell drugs from doing so. See De La Cruz, 870 F.2d at 1196-98; Gomez, 797 F.2d at 419-21; Munoz, 974 F.2d at 495. A reasonable observer would believe that this is appropriate because deterring foreigners, among others, from dealing lethal drugs in the United States is important to protecting the public, an interest every sentence is required to serve. See §3553(a)(2)(B), (C).

A reasonable observer would also know that the court imposed a 54-month sentence, which was 16 to 33 months below the Guideline range, and lower than the sentence it would have otherwise imposed, because Guzman was an undocumented alien who would be deported. See Apr. 7, 2021 Tr. at 44. The Eleventh Circuit has written, "[i]t seems to us unlikely that a reasonable observer, aware of all of the record facts, would have inferred that the court imposed a longer sentence on [defendant] because of how she came to reside in this country. The sentence was 91 months, which was a 60-month variance below the lower end of the advisory range of 151 to 188 months." Rodriguez, 627 F.3d at 1381. Similarly, in this case, the court imposed a sentence that was 16 to 33 months below the Guideline range based in meaningful measure on the fact that Guzman was an undocumented Dominican who would be deported. Therefore, a reasonable observer would believe that Guzman benefitted by virtue

of his national origin and was not adversely affected by it. This conclusion would be reinforced by the court's comment that it had seriously considered imposing a 70-month sentence and if it had any concern about its 54-month sentence, it was that it was too low, rather than too high in view of the "extremely serious" nature of Guzman's offense. Apr. 7, 2021 Tr. at 41.

Finally, with regard to matters in the record of the sentencing hearing, a reasonable observer would know that the court expressly stated to Mr. Milligan that, "I can assure you whatever sentence I give Mr. Guzman will not be influenced by the fact that he's from Bani," and that Mr. Milligan thanked the court for that assurance. Id. at 13. In addition, a reasonable observer would know that the court afforded Mr. Milligan an opportunity to object to the sentence imposed, and the stated reasons for it, and Mr. Milligan did not object. See id. at 45. This court does not believe that a reasonable observer would think that federal judges, who take a solemn oath to obey the Constitution and laws of the United States, generally lie. The court also does not believe that a reasonable observer, if fully informed concerning the facts relating to Guzman's sentencing, could think that the court's assurance that Guzman's sentence would not be affected by his national origin was untruthful or unreliable.[10] See First

---

[10] The court also believes that a reasonable observer would not believe that Mr. Milligan, who the court commended for his

39

Interstate Bank of Ariz., 210 F.3d at 988 ("[J]udges . . . are presumed to be impartial and to discharge their ethical duties faithfully so as to avoid the appearance of impropriety."); Aguinda, 241 F.3d at 204.

As explained earlier, this case is materially different than Trujillo-Castillon. In that case, the Seventh Circuit favorably cited its decision in De La Cruz, 870 F.2d at 1198. In De La Cruz, the court found that a sentence was not impermissible because the sentencing judge "made it clear that he . . . regarded [defendant] as a 'big time' drug dealer who had been involved with other prominent convicted Cuban drug traffickers." Id. This court believes that a reasonable observer would similarly conclude that Guzman was not adversely affected at sentencing by his Dominican origin, but benefitted from it, and received a 54-month sentence because the court found that in view of the seriousness of Guzman's offense an even greater variance from the Guideline range would not be sufficient. As also explained earlier, Trujillo-Castillon was remanded because the sentencing judge "did nothing to reasonably assure the defendant that his Cuban heritage would not factor into [his sentencing] calculus." Id. The Seventh Circuit cited and quoted an Eighth Circuit case in which the court remanded

"powerful" advocacy, was too timid to object to the reasoning for its sentence if he thought it was objectionable. Apr. 7, 2021 Tr. at 45; see also Rodriguez, 627 F.3d at 1379-80.

"'[b]ecause we cannot say that the district court would have imposed the same sentence absent this impermissible consideration' of the defendant's status as a Nigerian immigrant." Id. at 579-80 (quoting Onwuemene, 933 F.2d at 652). In contrast, in the instant case, the court assured Guzman that his sentence would not be influenced by the fact that he was a Dominican from Bani, and the court's full explanation for its sentence was consistent with this assurance. See Apr. 7, 2021 Tr. at 13.

In addition, unlike in Trujillo-Castillon, this court did not make generalizations about all Dominicans or "contrast[] the values held by Americans with people, like the defendant, who come from" the Dominican Republic. 692 F.3d at 579. Rather, the court simply noted the large number of defendants from Bani it had sentenced in the past twenty years for selling drugs.

In Kaba, the Second Circuit stated that "[a] defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." 480 F.3d at 156 (quoting Leung, 40 F.3d at 586) (emphasis added). In the instant case, a reasonable observer would know that Guzman's national origin benefitted him and did not adversely affect his sentence.

In Kaba, the Second Circuit also wrote that "[i]t has long been settled in this Circuit that although '[r]eference to national origin and naturalized status is permissible' during sentencing, it is allowed only 'so long as it does not become the basis for

determining the sentence.'" Id. (quoting United States v. Jacobson, 15 F.3d 19, 23 (2d Cir. 1994)) (emphasis added). In the instant case, a reasonable observer would know that this court considered all of the relevant §3553(a) sentencing factors and was required to impose a sentence that was commensurate with the seriousness of the crime of dealing fentanyl. A reasonable observer would also know that, although the court referenced people from Bani, among others, in addressing the need for the sentence to provide general deterrence, that reference was not the basis for determining Guzman's sentence.

In Kaba, the Second Circuit remanded for resentencing because of the district "court's apparent suggestion that the sentence was based, at least in part, on the defendant's" national origin. Id. at 158. In this case, the court did the opposite, expressly assuring the parties that "whatever sentence I give Mr. Guzman will not be influenced by the fact that he's from Bani." Apr. 7, 2021 Tr. at 13. Therefore, a reasonable observer fully informed of the court's statements at Guzman's sentencing could not think that Guzman's sentence was based even in part on his national origin except to the extent that he received a sentence lower than the sentence that would otherwise have been imposed because he was a deportable alien.[11]

---

[11] The First Circuit did not decide Kaba or Trujillo-Castillon and, therefore, they are not precedents that bind this court. See United

As indicated earlier, in view of the foregoing, a reasonable observer could not believe that Guzman's below-Guideline sentence was impermissibly affected by consideration of his status as an undocumented alien from Bani, Dominican Republic. However, if Mr. Milligan had objected to the sentence imposed and the reasons for it, the court would have amplified the record and provided additional information that would reinforce that conclusion.

First, the court would have noted the explicit assurance it gave Mr. Milligan earlier and expressly reassured Guzman that the fact that he was a Dominican from Bani did not cause or contribute to the court's decision to impose a 54-month sentence rather than the 24 months his counsel advocated. The court would also have further explained that its decision to impose a 54-month sentence was the result of considering all of the relevant §3553(a) factors, which, among other things, require a sentence that is sufficient in view of the very serious crime that Guzman committed. The court would have also reiterated and explained that Guzman actually benefitted from being an undocumented alien because the court gave him a lower sentence than it otherwise would have because Guzman was an alien who would be deported. See Hercules, 947 F.3d at 9.

_____

States v. Lopez, 890 F.3d 332, 341 (1st Cir. 2018) ("[S]ister circuit decisions [are] not binding on this court"). Nor did the First Circuit cite these decisions, or state that it agrees with the reasoning and result of either or both of them. In any event, as explained above, there are material distinctions between Kaba and Trujillo-Castillon and the instant case.

In addition, if Mr. Milligan had made to this court the arguments that he made to the First Circuit, it would have responded with additional information relevant to whether a reasonable observer could doubt the truthfulness of the court's assurance that Guzman would not be adversely affected by his status as an undocumented alien from Bani, Dominican Republic. The record would have included additional evidence that would cause a reasonable observer to be confident that I am not biased or prejudiced against immigrants generally or Dominicans, including from Bani, particularly, and that I would not and did not improperly consider national origin in determining Guzman's sentence. Among other things, a reasonable observer would know from the amplified record that I have a long history of assisting refugees and immigrants. More specifically, a reasonable observer would know that I was honored by the President of the United States in 1975 for my work in the resettlement of Vietnamese, Cambodian, and Laotian refugees; that in 1999 I received an award for my work on behalf of Cambodian children in Lowell, Massachusetts; and in 2012 I organized an exhibition program at the United States District Court for the District of Massachusetts to educate students and the public on the experience and plight of Cambodian refugees. See Exhibit 1C. All of this was consistent with my extrajudicial work for years on the Advisory Board of the International Institute of New England.

In addition, a reasonable observer would know that I have also mentored many immigrants and the children of immigrants, including from the Dominican Republic.



A reasonable observer would also know that I chose Hilani Morales, an immigrant from the Dominican Republic, ██████████████████████████████, to speak as the representative of hundreds of former recipients of fellowships in programs I founded or co-founded when my portrait was presented to the District Court in 2010. She described the significant impact that my mentorship had on her life. Among other things, I had previously presided at a special ceremony making her a United States citizen and subsequently performed her wedding ceremony.

In addition, with Hilani and Harvard College students, I have since 2014 taught poetry to fourth grade students at the Trotter School in Dorchester, Massachusetts. Many are immigrants or the children of immigrants. Some are Dominican. The students are important to me and as some of them write in their poems and tell me, I am important to them.

While not material to whether a reasonable observer would believe that Guzman's 54-month sentence was based even in part on impermissible consideration of his national origin, this additional information would have been part of the record of Guzman's sentencing if Mr. Milligan had objected to the sentence and the stated reasons for it, and would reinforce a reasonable observer's understanding that Guzman had not been adversely affected by his national origin.

IV. CONCLUSION AND ORDER

This court understands and agrees that a defendant may not be punished more severely even in part because he or she is an alien rather than a United States citizen. That did not occur in this case and the court does not believe that a fully informed reasonable observer could think it did. Therefore, it is hereby ORDERED that:

1. As no further proceedings are necessary or appropriate before Guzman is resentenced, his resentencing will be conducted on June 9, 2022, at 2:00 p.m., in the Moakley Federal Courthouse unless Guzman, by June 1, 2022, requests that the resentencing hearing be conducted by videoconference or waives his right to a resentencing hearing.

2. After Guzman is resentenced, this sealed Memorandum and Order, the redacted version of it that is on the public docket, and an Amended Judgment shall be transmitted to the First Circuit.

46

UNITED STATES DISTRICT JUDGE